OR TO FILE
PER CHAMBERS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CHERI J. NUTTER,                     )      Case No. 04CV2266 DMS (RBB)
                                     )
                 Plaintiff,          )      FED. R. CIV. P. 53(f) REPORT
                                     )      AND RECOMMENDATION
       -against-                     )      REGARDING FINAL POSTING
                                     )      OF CREDITS ~~AND~~
NCO FINANCIAL SYSTEMS, INC.,         )      ~~[PROPOSED] ORD~~ER
                                     )
                 Defendant.          )
                                     )
JANNIE DUPREE,                       )
                                     )
                 Plaintiff,          )
                                     )
       -against-                     )
                                     )
NCO FINANCIAL SYSTEMS, INC.,         )
                                     )
                 Defendant.          )
                                     )



FILED

OCT - 3 2006

SOU
BY

INTRODUCTION

This Report and Recommendation is submitted by The Honorable Herbert B. Hoffman (Ret.), who was appointed by the Court to serve as a special master in this class action lawsuit (hereinafter referred to as the "Lawsuit") per Fed. R. Civ. P. 53.

On April 21, 2006, the Court entered a Final Order and Judgment (hereinafter referred to as the "Final Approval Order") in this settled Lawsuit. Per the Court's Final Approval Order, the undersigned was given specific authority to ensure settlement compliance.

The undersigned has reviewed David Israel's May 9, 2006 letter, attached as Exhibit A; Elizabeth J. Arleo's August 18, 2006 letter, attached as Exhibit B; NCO's Memorandum in

1

Fed. R. Civ. P. 53(f) Report and Recommendation                    Case No. 04CV2266 DMS (RBB)
Regarding Final Posting of Credits and [Proposed] Order

1   Support of Posting of Final Credits, along with related exhibits, attached as Exhibit C; and,

2   Christina E. Wickman's September 21, 2006 letter, attached as Exhibit D.  Based upon the

3   record and argument of counsel, the undersigned recommends that the below Order be entered

4   regarding the final posting of NCO Portfolio Management, Inc. (hereinafter referred to as

5   "NCOP") credits, requiring NCO to post an additional, approximate $15.8 million in NCOP

6

7   credits no later than three weeks after entry of the below Order by the Court.

8                                    DISCUSSION

9        On April 21, 2006, the Court entered the Final Approval Order, finally certifying the

10   Lawsuit as a class action and approving the proposed class action settlement.  After the Final

11   Approval Order was entered, in compliance with the Settlement Agreement (hereinafter

12   referred to as "Agreement"), NCO posted NCOP credits on April 20 and May 4, 2006.

13   Following application of the credits, a dispute arose regarding the interpretation of ¶ 23(B) of

14   the Agreement with respect to application of NCOP credits.  Specifically, Class Counsel

15

16   alleged that, prior to applying the credits, NCOP improperly sold accounts that were to

17   receive credits. *See* Exhibit B, Arleo 8/18/06 Ltr.  NCO contended that it acted in good faith

18   at all times and that the Agreement did not require NCOP to change its normal business

19   practice of selling accounts at the end of a fiscal quarter. *See* Exhibit C, NCO Memo.

20        As Special Master, and in answer to complaints raised by Class Counsel, I questioned

21

22   how NCO could address the issue of accounts being sold in the "normal course of business."

23   While NCO denied any wrongdoing, initially, NCO committed to repurchasing or crediting

24   the accounts that were sold.  NCO later learned, as detailed in the affidavit of its General

25   Counsel, Joshua Gindin, that NCO did not have the contractual right and there was no

26

27

28   Fed. R. Civ. P. 53(f) Report and Recommendation                    Case No. 04CV2266 DMS (RBB)
     Regarding Final Posting of Credits and [Proposed] Order

                                        2

commercially feasible way to repurchase or credit sold NCOP accounts.   After several telephone conferences, NCO ultimately agreed to post an additional, approximate $15.8 million in NCOP credits across the approximate, remaining 1,590,185 open, applicable NCOP accounts.   This additional posting would provide credit for the 74,830 non-bankrupt accounts sold after the Agreement was executed, amounting to $11,259,506 in NCOP credits, and credit for the 31,323 accounts included as part of the "September Snapshot" that were coded as being in Chapter 7 at that time, amounting to $4,570,834.99 in NCOP credits.   The ultimate effect of NCO's willingness to post the $15.8 million in additional, NCOP credits guarantees that NCO will not enjoy any financial windfall from the selling of the NCOP accounts.

NCO's proposal is acceptable to Class Counsel Steven A. and Christina E. Wickman, but not Ms. Arleo. *See* Exhibit D, Wickman 9/21/06 Ltr.   Ms. Arleo argues that NCO should be compelled to buy-back the sold accounts. *See* Exhibit B, Arleo 8/18/06 Ltr.

Notwithstanding Ms. Arleo's opposition, the undersigned finds that NCO's proposal complies with the settlement terms and is a fair and adequate resolution to the current dispute for at least four reasons.   First, as NCO correctly notes, the Agreement does not contain any express prohibition against selling NCOP accounts.

Second, pursuant to Cal. Civ. Code § 1654, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."   Considering that Class Counsel could have demanded more clarity in the Agreement regarding NCOP credits, but did not, the undersigned finds that the Agreement should be interpreted against Class Counsel under Cal. Civ. Code § 1654.

Fed. R. Civ. P. 53(f) Report and Recommendation                                         Case No. 04CV2266 DMS (RBB)
Regarding Final Posting of Credits and [Proposed] Order

Third, as detailed in NCO's supporting memorandum and the affidavit of Mr. Gindin (attached to NCO's memo.), NCOP's standard sale document does not provide NCOP with a right to repurchase accounts.

Finally, a buy-back would create insurmountable administrative problems for NCO and the Court.  Since the sale, many of the sold NCOP accounts have been paid, closed for numerous reasons, and resold to other buyers.  In light of this fact, the undersigned finds that it would be impossible to repurchase all of the sold NCOP accounts back and then attempt to apply credits to the accounts.

CONCLUSION

For the reasons set forth above, and pursuant to Fed. R. Civ. P. 53, the undersigned respectfully recommends that the Court enter the below Order, ordering NCO to post the additional, approximate $15.8 million in NCOP credits no later than three weeks after entry of the Order by the Court.

IT IS SO RECOMMENDED,

This _3rd_ day of _October_ 2006.

_____
Judge Herbert B. Hoffman (Ret.)

IT IS SO ORDERED,

NCO shall post an additional, approximate $15.8 million in NCOP credits no later than three weeks after entry of this Order by the Court.

This ___ day of _____ 2006.

_____
Honorable Dana M. Sabraw

4





# SESSIONS
# FISHMAN
# & NATHAN LLP

### ATTORNEYS
A PARTNERSHIP INCLUDING
PROFESSIONAL CORPORATIONS
www.sessions-law.com

DAVID ISRAEL
Office: 504-828-3700
Cell: 504-669-0234
disrael@sessions-law.com
Respond to <u>Metairie Office</u>

May 9, 2006

PERSONAL & CONFIDENTIAL

<u>Via Fax: 858-277-3456</u>
Steven Wickman, Esq.
Christina Wickman, Esq.
WICKMAN & WICKMAN
55 Murphy Canyon Road, Suite 100
San Diego, CA 92123

<u>Via Fax: 760-789-8081</u>
Elizabeth Arleo, Esq.
LAW OFFICES OF ELIZABETH J. ARLEO
850 Main Street, Suite 201
Ramona, CA 92065

> **Re:**   ***Cherri J. Nutter v. NCO Financial Systems, Inc.***
> ***c/w Jannie DuPree v. NCO Financial Systems, Inc.,***
> **Case No. 04-2266, S.D. Calif.**

Dear Counsel:

    I have now received information relating to the application of credits. Please consider the following:

1. **CREDIT POSTING-** In accordance with our agreement to immediately apply credits, a total of $215,183,424.88 in credits has been applied to the remaining 9/30/05 "snapshot" accounts, numbering 1,590,185 and open as of April 20. Of this total, all but $182,322.65 was applied on April 20, with this small balance having been applied on May 4, 2006. Per our Agreement, on September 30, 2005, there were 1,753,798 NCO Portfolio accounts that were identified to receive credits totaling $241,035,127.06.

2. **ACCOUNT DETAILS-** NCO has provided details relating to the account statuses of the initial account snapshot as of April 20, 2006. Of the original 1.75 million

<u>New Orleans Office</u>
201 St. Charles Avenue
Thirty-Fifth Floor
New Orleans, LA 70170-3500
Telephone (504) 582-1500
Fax (504) 582-1555

<u>Metairie Office</u>
Lakeway Two, Suite 1240
3850 North Causeway Boulevard
Metairie, LA 70002-1752
Telephone (504) 828-3700
Fax (504) 828-3737



EXHIBIT
A

SESSIONS FISHMAN & NATHAN ᴸᴸᴾ

S. Wickman, C. Wickman & E. Arleo – Credit Applications Analysis
May 9, 2006 – Page 2

accounts, 90.67%, or 1,590,185 accounts from the initial total, were open and available for posting on April 20, 2006.

3. We have discussed that after 9/30/05 that 145,196 accounts were sold, representing 8.28% of the initial 1.75 million accounts subject to receiving a credit. Of the $241 million in credits calculated for application on September 30, 2005, the 145,196 accounts were due to receive $21,534,709.65 in credits.

4. As we have previously discussed, approximately 50%, or 70,366 accounts of the 145,196 sold accounts were in bankruptcy.  Of the $21 million credit total, $10,275,198 represented credit for bankrupt accounts, with the remaining $11,259,506 credits to be applied to the sold, non-bankrupt accounts totaling 74,830.

5. Of the initial 1.75 million accounts, as of April 20, 18,416 accounts were closed in the normal course of business, representing 1.05% of the original total and $2,515,543.58 in credits that were part of the $241 million.  Of the closed accounts no longer active due to "normal course of business reasons," various descriptions and reasons exist for the closures including: uncollectible; judgment no assets; fraud; deceased; dispute; settlement; bankruptcy; identify theft; etc.   These accounts are never to be worked again by NCO, nor sold to any third party.  Said another way, these accounts are "dead."

6. Per the Special Master's Ruling and as we agreed, regardless if there was any pay down on any account, the dollar value of the 9/30/05 credit for that account was applied to the existing account balance as of April 20.  For example, assume that there was a $1,000 account as of 9/30/05- this account was due to receive 10%, or $100.  Assume further that as of April 20, the account had been paid down to $500.  Consequently, as of April 20, $100 was applied to that $500 remaining balance, for a new balance of $400.  As another example, assume that on 9/30/05 there was an account with a $2,000 balance.  This account would have been scheduled to receive the $164 cap, since the 10% credit would have been $200, exceeding the $164 cap.  If post-9/30/05, the account had been paid down to $100, then the application of $164 would have zeroed out the account, even though $100 was applied to zero-out the account.  As a result of the application of credits in this manner, a total of $1,801,284.95 could not be applied.

7. <u>CREDITS APPLIED TO BANKRUPT ACCOUNTS AS OF 9/30/05</u>- Mr. Wickman raised the question as to what number of the original 1.75 million accounts were in a bankrupt status as of September 30, 2005 and had credits applied as part of the $241 million calculation.  Of the 1.75 million accounts, 48,045 accounts were deemed bankrupt, creating $7,030,386.01 in credits.  Of this 48,045 account/$7 million total, 31,323 accounts, with a credit value of $4,570,834.99 were coded as being in Chapter 7, with the balance being Chapter 13, or pending bankruptcy.  As I have discussed with Mr. Wickman, there is value to consumers with credits being applied to the Chapter 13 accounts and the pending bankruptcy accounts.

# SESSIONS FISHMAN & NATHAN LLP

S. Wickman, C. Wickman & E. Arleo – Credit Applications Analysis
May 9, 2006 – Page 3

8. **SETTLEMENT ANALYSIS & PROPOSAL**- While nothing is owed by way of any lost credits due to: (a) the specific wording of the Settlement Agreement and (b) the fall-off in accounts due to the "normal course of business," NCO is interested in avoiding enforcement litigation relating to the Agreement. Being as "generous" as possible regarding some type of remedy for "lost credits," there appears to be 2 categories that could only be subject to dispute: (a) the $4.5 million of credits for the Chapter 7 accounts, included in the initial credit calculation of $241 million, and (b) the $11.2 million of credits relating to the non-bankrupt accounts that were part of the 145,196 accounts that were sold after the 9/30/05 snapshot. While I am still having NCO re-check all account summaries, the exact total of this proposed and belated credit application would equal $15,830,340.99.

9. NCO proposes that $15.8 million of credits be applied across the board to the accounts that were initially part of the 9/30/05 snapshot and now numbering 1,590,185. In round numbers, the total credits applied would then equal nearly $231 million, representing the $215 million that was applied on April 20 and the $15.8 million yet to be applied. Applying the credits equally, $9.96/account for the remaining 1,590,185 accounts would be applied. As with the previous credit applications of a maximum of $164/account, to the extent that there is any account with a balance now remaining of $9.96 or less, then the account would be closed.

10. As noted, a total of $231 million in credits is proposed to be applied. For the approximate $10 million shortfall from the original agreed-upon $241 negotiated credit application, this $10 million difference represents: $2.5 million- closed in normal course of business; $1.8 million- could not be applied because of reduced account balances as of April 20; $5.7- amount representing bankruptcy accounts that were sold as result of bankruptcy closures, all after September 30.

Once you have considered these issues, please call me.

Very truly yours,

David Israel

DI:lb
cc:     Hon. Herbert B. Hoffman        (via fax: 858-755-7460)
        R. Gaylord Smith, Esq.         (via e-mail)
        Tim J. Vanden Heuvel, Esq.     (via e-mail)
        Bryan C. Shartle, Esq.         (via e-mail)
        Joshua Gindin, Esq.            (via e-mail)
N:\NCO\matter\Credits Proposal FINAL May 9.doc

FAXED

E-MAILED

# Arleo Law Firm, PLC

Elizabeth J. Arleo
Elizabeth@ArleoLaw.com

August 18, 2006

VIA FACSIMILE
619/ 595-5450

The Honorable Herbert B. Hoffman
Judge of the California Superior Court, Retired
Symphony Towers
750 B Street, Suite 3300
San Diego, CA 92101

Re:   *Nutter v. NCO Financial Systems, Inc. (05-21)*

Dear Judge Hoffman,

This letter states my objection to NCO's R&R Re: Final Posting of Credits dated July 27, 2006.

NCOP's sale of 145,196 accounts two months before final approval was improper. These accounts were not closed as a result of death, bankruptcy and payoffs. Nor is this a "dispute ... regarding the interpretation" of the settlement agreement as NCO contends.

In December, 2005, all class members (including these accounts) were notified they would receive a 10% credit if their account remained "open" when the settlement was finally approved. The 145,196 accounts represent 8.28% of the initial 1.75 million accounts subject to receiving a credit. They were due to receive over $21.5 million of the $241 million credits. Paying other class members what properly belongs to the 145,196 accounts does not fulfill NCO's promise.

The fact that NCOP no longer owns the 145,196 accounts does not prevent it from issuing the 10% credit as promised. These accounts are subject to a repurchase clause in the sales agreement, which clause will allow NCO to easily compel the purchaser to either (1) issue the 10% credit, or (2) return the account to NCO.

If Your Honor believes the terms of the R&R provide an adequate resolution, I respectfully request an opportunity to brief the issue before Judge Sabraw.

Sincerely,

Elizabeth J. Arleo

cc:   David Israel & Bryan Shartle

EXHIBIT
tabbies
B

1  David Israel, Esq. (LSB No. 7174)       (SPACE BELOW FOR FILING STAMP ONLY)
     Bryan C. Shartle, Esq. (LSB No. 27640)
2  SESSIONS, FISHMAN & NATHAN, L.L.P.
     3850 North Causeway Boulevard
3  Lakeway Two, Suite 1240
     Metairie, Louisiana 70002-1752
4  Telephone:   (504) 828-3700
     Facsimile:    (504) 828-3737
5

6  Thomas J. Lincoln, Esq. (CSB No. 095131)
     Jill S. Dickerson, Esq. (CSB No. 220070)
7  LINCOLN, GUSTAFSON & CERCOS
     225 Broadway, Suite 2000
8  San Diego, California 92101
     Telephone: (619) 233-1150
9  Facsimile:  (619) 233-6949
10

11  Attorneys for Defendant

12               UNITED STATES DISTRICT COURT

13            SOUTHERN DISTRICT OF CALIFORNIA

14  CHERI J. NUTTER,         )   Case No. 04CV2266 DMS (RBB)
                      )
15          Plaintiff,    )   **MEMORANDUM IN**
                      )   **SUPPORT OF POSTING**
16                 )   **OF FINAL CREDITS**
     -against-       )
17                      )
     NCO FINANCIAL SYSTEMS, INC.,  )
18                      )
          Defendant.   )
19                      )
20  JANNIE DUPREE,        )
                      )
21          Plaintiff,    )
                      )
22     -against-       )
                      )
23  NCO FINANCIAL SYSTEMS, INC.,  )
                      )
24          Defendant.   )
25                      )

26

27

28

**EXHIBIT**

# I. INTRODUCTION

Defendant, NCO Financial Systems, Inc. ("NCO"), submits this memorandum in support of posting the final NCO Portfolio Management, Inc. ("NCOP") credits in this settled class action lawsuit ("Lawsuit"). As detailed in the proposed Report and Recommendation ("R&R") attached hereto as Exhibit A, while not obligated, NCO is willing to post an additional, approximate $15.8 million in NCOP credits across the remaining, open NCOP accounts applicable to this class action settlement to address Class Counsel's concerns. The proposed R&R should be issued and a final order should be entered, requiring NCO to post the proposed final credits.

# II. PROCEDURAL HISTORY AND FACTS

On November 12, 2004, the Lawsuit was filed against NCO. *See* Docket No. 1. The Lawsuit alleged that NCO systematically recorded and monitored/eavesdropped upon telephonic communications between California consumers and NCO debt collectors without the consent of the California consumers. *Id.* By doing so, the Lawsuit alleged that NCO violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, and California's Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq. Id.* The Lawsuit was filed on behalf of a California putative class for violations of the FDCPA (Count 1); CIPA for improper recording (Count 2); and, CIPA for improper monitoring/eavesdropping (Count 3). *Id.*

On April 11, 2005, pursuant to Fed. R. Civ. P. 53, The Honorable Herbert B. Hoffman (Ret.) was appointed to serve as a special master and oversee all settlement negotiations, as well as to accept assignments from the Court regarding pretrial and class issues in the Lawsuit. *See* Docket No. 20.

On April 27, 2005, the First Supplemental and Amended Class Action Complaint and Demand for Jury Trial was filed in the Lawsuit, adding Cheri J. Nutter (hereinafter referred to as "Plaintiff") and expanding the putative California class to a national class. *See* Docket No. 22. Pursuant to the amendment, Counts 2 (improper recording) and 3 (improper monitoring/eavesdropping) were amended to include claims under the various state and territorial laws requiring at least two-party consent to record and/or monitor telephone calls. *Id.*

On July 19, 2005, Jannie DuPree filed a Class Action Complaint and Demand for Jury Trial, asserting claims similar to those asserted by Plaintiff. On August 3, 2005, the DuPree lawsuit was consolidated into this Lawsuit. *See* Docket No. 40. That same day, the Second Supplemental and Amended Class Action Complaint and Demand for Jury Trial was filed in the Lawsuit. *See* Docket No. 39. Pursuant to the amendment, the original plaintiff was dropped from the Lawsuit due to her individual settlement with NCO. *Id.* Shortly thereafter, DuPree likewise settled her claims against NCO on an individual basis, leaving Plaintiff Nutter as the sole named plaintiff and class representative.

In September 2005, undersigned counsel and Class Counsel discussed the use of NCOP credits to compensate the class members. In order to ascertain the aggregate value of any credit, it was necessary to scan the NCOP database to determine the number and amount of the open accounts. On September 30, 2005, NCO scanned the NCOP database to obtain this data (hereinafter referred to as the "September Snapshot").

On November 3, 2005, after extensive arms-length negotiations, multiple mediation sessions, many dozens of telephone conferences, and substantial discovery, the Parties entered into a Settlement Agreement ("Agreement"). *See* Docket No. 56, at pp. 11-33. The

1   Agreement contains the following clause: "This Agreement contains the entire agreement

2   between the Parties and supersedes any and all other agreements between the Parties,

3   including any and all other mediation and settlement agreements." *Id.* at pp. 31-32, ¶ 40.

4   With respect to the posting of NCOP credits, the Agreement provides:

5

6       NCOP credits will be awarded on the second Tuesday after Final Judgment
Day (hereinafter referred to as "NCOP Credit Day"). Each Settlement Class

7       Member with an open NCOP account on NCOP Credit Day with Right Party
Contact before September 30, 2005 shall receive a 10% credit on his or her

8       NCOP account, with a maximum cap of $164. In other words, the credit will
be for 10%, but never to exceed $164.

9

10   *Id.* at p. 23, ¶ 23(B).

11       On December 5, 2005, the Court entered an Order of Preliminary Approval of Class

12   Action Settlement. *See* Docket No. 49.

13       On March 30, 2006, after the required class action notices were mailed and published,

14   a Fairness Hearing was held pursuant to Fed. R. Civ. P. 23.

15       On or about April 7, 2006, Special Master Hoffman submitted his R&R,

16   recommending final approval of the class action settlement. *See* Docket No. 54.

17

18       On April 21, 2006, the Court entered a Final Order and Judgment ("Final Approval

19   Order"). *See* Docket No. 56. Per the Court's Final Approval Order, the Court "continue[d]

20   the appointment of Special Master Hoffman . . . to oversee the obligations of the Parties for

21   the two year period that the injunction is effective against NCO and to continue to assist the

22   Parties with all issues that may arise with the implementation of this Court's order." *Id.* at p.

23   8.

24       As part of its normal business practice, NCOP sold a total of 145,196 of its accounts

25   through sales occurring at the end of each fiscal quarter from September 2005 to March 2006.

26

27

28

1  *See* Exhibit B, Sworn Statement of Joshua Gindin, at ¶ 5.  Of these 145,196 NCOP accounts,

2  70,366 of the sold accounts were in bankruptcy, 74,830 were not.  *Id.*  Selling part of a

3  portfolio at the end of a fiscal quarter is a common business practice used by debt purchasers,

4  such as NCOP.  *Id.*  For at least the last 4 years, NCOP has sold part of its portfolio at the end

5  of one or more fiscal quarters.  *Id.*

6

7          After the Final Approval Order was entered, in compliance with the Agreement, NCO

8  posted NCOP credits on April 20 and May 4, 2006, totaling $215,183,424.88.  *Id.* at ¶ 4.

9  These NCOP credits were spread across the remaining open, applicable 1,590,185 accounts.

10  *Id.*

11          Following application of the credits, a dispute arose regarding the interpretation of ¶

12  23(B) of the Agreement with respect to application of the NCOP credits.  NCO contended that

13  it was *not* obligated to post credits for accounts closed in the "normal course of business"

14  after the Agreement was executed.  In support of its argument, NCO relied on the Agreement,

15  which provides that "[e]ach Settlement Class Member with an *open NCOP Account on NCOP*

16  *Credit Day* . . . shall receive a 10% credit."  Docket No. 56, at p. 23, ¶ 23(B) (emphasis

17

18  added).  Class Counsel contended that the Parties negotiated based upon an aggregate amount

19  of credits, *i.e.*, $241,035,127.06 in credits, derived from the September Snapshot.  According

20  to Class Counsel, NCO was obligated to provide the negotiated $241 million in credits,

21  regardless of whether some of the applicable accounts were closed after the Agreement was

22  executed.  Class Counsel contended that an additional amount of NCOP credits should have

23  been applied.

24

25          Although not obligated, NCO ultimately agreed to post an additional $15,830,340.99

26  in NCOP credits, bringing the grand total of NCOP credits to approximately $231 million.

27

28

The proposed, additional $15,830,340.99 posting represented: (a) credit for the 74,830 non-bankrupt accounts sold after the Agreement was executed, amounting to $11,259,506 in NCOP credits; and (b) credit for the 31,323 accounts included as part of the September Snapshot that were coded as being in Chapter 7 at that time, amounting to $4,570,834.99 in NCOP credits. NCO proposed that the approximate $15.8 million in NCOP credits be applied across the board to the remaining open, applicable NCOP accounts numbering approximately 1,590,185. Applying the credits equally, each remaining NCOP account would have received an additional credit of approximately $9.96.

On August 18, 2006, Class Counsel Elizabeth J. Arleo submitted a letter brief to Special Master Hoffman. *See* Exhibit C, 08/18/06 Ltr. Ms. Arleo argues as follows:

> NCOP's sale of 145,196 accounts two months before final approval was improper. These accounts were not closed as a result of death, bankruptcy and payoffs. Nor is this a "dispute . . . regarding the interpretation" of the settlement agreement as NCO contends.
>
> . . . .
>
> The fact that NCOP no longer owns the 145,196 accounts does not prevent it from issuing the 10% credit as promised. These accounts are subject to a repurchase clause in the sales agreement, which clause will allow NCO to easily compel the purchaser to either (1) issue the 10% credit, or (2) return the account to NCO.

*Id.*

On August 25, 2006, a telephone conference was held to discuss Ms. Arleo's opposition to NCO's proposal to provide the additional NCOP credits. Special Master Hoffman requested that NCO submit a formal response to Ms. Arleo's August 18, 2006 letter brief. By order of Judge Hoffman, NCO's response is due on or before noon (California time) of September 15, 2006.

1

## III. LEGAL ARGUMENT AND SUMMARY

2          "[C]ourts are *not* permitted to modify [class action] settlement terms or in any manner

3   to rewrite [class action settlement] agreements reached by parties." *Jeff D. v. Andrus*, 899

4   F.2d 753, 758 (9th Cir. 1989).  As the Supreme Court has ruled, "Rule 23(e) wisely requires

5   court approval of the terms of any settlement of a class action, but the power to approve or
6
7   reject a settlement negotiated by the parties before trial does not authorize the court to require

8   the parties to accept a settlement to which they have not agreed." *Evans v. Jeff D.*, 475 U.S.

9   717, 726 (1986).

10         "In interpreting [class action settlement agreements], [the Ninth Circuit] has held that

11  'familiar principles of contract law' apply." *Barton v. Albertson's, Inc.*, 2004 WL 2524387,

12  *1 (9th Cir. 2004).  "The first step in contractual interpretation in California is to examine the
13
14  text . . . and determine the intent of the parties." *Armstrong v. Davis*, 275 F.3d 849, 876 (9th

15  Cir. 2001) (*citing* Cal. Civil Code §§ 1636 and 1638).  "The language of a contract is to

16  govern its interpretation, if the language is clear and explicit, and does not involve an

17  absurdity." Cal. Civ. Code § 1638.  "The whole of a contract is to be taken together, so as to

18  give effect to every part, if reasonably practicable, each clause helping to interpret the other."

19  Cal. Civ. Code § 1641.  "The words of a contract are to be understood in their ordinary and
20
21  popular sense, rather than according to their strict legal meaning; unless used by the parties in

22  a technical sense, or unless a special meaning is given to them by usage, in which case the

23  latter must be followed."  Cal. Civ. Code § 1644.  "If the terms of a promise are in any

24  respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor

25  believed, at the time of making it, that the promisee understood it." Cal. Civ. Code § 1649.

26  "In cases of uncertainty not removed by the preceding rules, the language of a contract should

27

28

1   be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ.

2   Code § 1654.

3       **A.   The Agreement Does Not Require NCO To Post Any Additional NCOP**
        **Credits**
4

5       The Agreement provides the following regarding NCOP credits:

6       NCOP credits will be awarded on the second Tuesday after Final Judgment
        Day (hereinafter referred to as "NCOP Credit Day").  Each Settlement Class
7       Member *with an open NCOP account on NCOP Credit Day* with Right Party
        Contact before September 30, 2005 shall receive a 10% credit on his or her
8       NCOP account, with a maximum cap of $164.

9
    Docket No. 56, at p. 23, ¶ 23(B) (emphasis added).  This language is "clear" and explicit."
10
    *See* Cal. Civ. Code § 1638.  NCO was *not* obligated to apply NCOP credits to any account
11
    that was closed (*i.e.*, not "open") on NCOP Credit Day.  NCO complied with the Agreement
12
    by providing approximately $215 million in NCOP credits on April 20 and May 4, 2006.
13

14      Ms. Arleo contends that NCO was required to post NCOP credits to all NCOP

15  accounts open on the day the Agreement was signed, unless later closed "as a result of death,
16
    bankruptcy and payoffs."  Exhibit C, 08/18/06 Ltr.  There is no support for Ms. Arleo's
17
    fanciful interpretation of the Agreement.  Indeed, nowhere in the Agreement is NCO
18
19  prohibited from closing or selling any NCOP account, particularly if such was done in the

20  normal course of business.  As proven by Mr. Gindin's statement, the sale of the 145,196

21  NCOP accounts occurred in the normal course of business.  *See* Exhibit B, Gindin Statement,

22  at ¶ 5.  As a matter of law, Ms. Arleo is "not permitted to modify [the] settlement terms or in
23
    any manner to rewrite [the Agreement] reached by [the] parties [here]."  *Jeff D.*, 899 F.2d at
24
25  758.

26

27

28
                                            **8**

Further, to the extent that there is any uncertainty as to the interpretation of the Agreement, considering that Class Counsel participated in the drafting of the Agreement and at no time requested any limitation be imposed upon the closing or selling of NCOP accounts, "the language of [the Agreement] should be interpreted most strongly against [Class Counsel] who caused the uncertainty to exist." Cal. Civ. Code § 1654. Class Counsel could have demanded more clarity in the Agreement regarding NCOP credits, but they did not.

## B. Although Not Obligated, NCO Is Willing To Post Additional NCOP Credits To Address Class Counsel's Concerns

As noted above, NCO obtained a "snapshot" of the aggregate amount of all the NCOP accounts on September 30, 2005. Based upon this September Snapshot, undersigned counsel and Class Counsel anticipated that an aggregate amount of approximately $241 million in NCOP credits would be applied. Because the NCOP accounts are *not* static and are subject to closure for various reasons, all counsel understood that the anticipated amount of $241 million was subject to change and represented a "best guess."

The Agreement contains the following clause: "This Agreement contains the entire agreement between the Parties and supersedes any and all other agreements between the Parties, including any and all other mediation and settlement agreements." *See* Docket No. 56, at pp. 31-32, ¶ 40. This clause, referred to as a "merger clause," effectively merged all agreements and understandings between the Parties into the Agreement. *See, e.g., SunUp Design Systems, Inc. v. EchoStar Satellite Corp.*, 2002 WL 32817414, *5 (N.D. Cal. 2002) ("Because the [Agreement] contained an unambiguous merger clause, the Court concludes, as it did previously, that Plaintiff was not entitled to rely on Defendant's oral promises to create quasi-contractual rights."). Said another way, Class Counsel cannot rely upon any discussions

or agreements reached before the Agreement was executed when interpreting the unambiguous language relating to NCOP credits. *Id.*

In her August 18, 2006 letter, Ms. Arleo contends that the sold NCOP accounts "are subject to a repurchase clause in the sales agreement, which clause will allow NCO to easily compel the purchaser to either (1) issue the 10% credit, or (2) return the account to NCO." Exhibit C, 08/18/06 Ltr.  As set forth in Mr. Gindin's statement, Ms. Arleo is wrong for at least 3 reasons. *See* Exhibit B, Gindin Statement, at ¶ 6.

First, NCOP's standard sale document does not provide NCOP with a right to repurchase accounts. *Id.*  From time-to-time, NCOP is able to repurchase an account or two from a buyer for certain discrete reasons, like disputes or bankruptcies. *Id.*  Second, even if NCOP could repurchase the accounts, with respect to the accounts in question, the cost to do so would be substantially more than received by NCOP. *Id.*  In other words, NCOP would have to pay a premium to buy these accounts back. *Id.*  Third, and perhaps most importantly, a buy-back would create insurmountable administrative problems. *Id.*  Since the sale, many of the sold accounts have been paid, closed for numerous reasons, and sold to other buyers. *Id.*  It would be impossible to buy all of the sold accounts back and then attempt to apply credits to the accounts. *Id.*

Notwithstanding the unambiguous language and merger clause, NCO has agreed to post an additional, approximate $15.8 million in NCOP credits across the remaining 1,590,185 open, applicable NCOP accounts, amounting to an additional credit of approximately $9.96/account.  With the additional posting, the grand total of NCOP credits will be approximately $231 million, approximately $10 million short of the anticipated, aggregate amount of $241 million discussed with Class Counsel based upon the September

1  Snapshot.  This additional posting provides credit for the 74,830 non-bankrupt accounts sold

2  after the Agreement was executed, amounting to $11,259,506 in NCOP credits, and credit for

3  the 31,323 accounts included as part of the September Snapshot that were coded as being in

4  Chapter 7 at that time, amounting to $4,570,834.99 in NCOP credits.

5
## IV.  CONCLUSION
6

7       Although not obligated, to avoid any dispute and to ensure that the class members are

8  treated extraordinarily fair, NCO is willing to provide additional NCOP accounts totaling

9  approximately $15.8 million.  The proposed R&R should be issued and a final order should be

10  entered, requiring NCO to post the proposed, final credits.

11                                       Respectfully Submitted,

12

13

14                                    David Israel, Esq. (LSB No. 7174)

          CERTIFICATE OF SERVICE           Bryan C. Shartle, Esq. (LSB No. 27640)

15                                    SESSIONS, FISHMAN & NATHAN, L.L.P.

     I hereby certify that a copy of the      3850 North Causeway Boulevard

16  above and foregoing has been forwarded   Lakeway Two, Suite 1240

to all counsel of record ___ by hand; ___  Metairie, Louisiana 70002-1752

17  by fax; ✓ by e-mail; ___ by FedEx; ___  Telephone:   (504) 828-3700

by placing a copy of same in the U.S.    Facsimile:   (504) 828-3737

18  Mail, postage prepaid this 14th day of

September 2006.

19                                      Thomas J. Lincoln, Esq. (CSB No. 095131)

20                                    Jill S. Dickerson, Esq. (CSB No. 220070)

             Bryan C. Shartle          LINCOLN, GUSTAFSON & CERCOS

21                                    225 Broadway, Suite 2000

                                San Diego, California 92101

22                                    Telephone:  (619) 233-1150

                                  Facsimile:  (619) 233-6949

23

24                                    Attorneys for Defendant,

                                  NCO Financial Systems, Inc.

25  N:\NCO\Nutter\Correspondence\Class Action Settlement\Final Draft R&R Docs\Final Draft Credit Posting Brief.doc

26

27

28                              11

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHERI J. NUTTER, | ) | Case No. 04CV2266 DMS (RBB) |
| Plaintiff, | ) ) | FED. R. CIV. P. 53(f) REPORT AND RECOMMENDATION |
| -against- | ) ) | REGARDING FINAL POSTING OF CREDITS AND |
| NCO FINANCIAL SYSTEMS, INC., | ) ) | [PROPOSED] ORDER |
| Defendant. | ) ) | |
| JANNIE DUPREE, | ) | |
| Plaintiff, | ) ) | |
| -against- | ) ) | |
| NCO FINANCIAL SYSTEMS, INC., | ) ) | |
| Defendant. | ) ) | |

**EXHIBIT**
**A**

<u>INTRODUCTION</u>

This Report and Recommendation is submitted by The Honorable Herbert B. Hoffman (Ret.), who was appointed by the Court to serve as a special master in this class action lawsuit (hereinafter referred to as the "Lawsuit") per Fed. R. Civ. P. 53.

On April 21, 2006, the Court certified the Lawsuit as a class action and approved the proposed class action settlement. The Parties now request an order regarding the final posting of NCO Portfolio Management, Inc. (hereinafter referred to as "NCOP") credits by defendant, NCO Financial Systems, Inc. (hereinafter referred to as "NCO").

In addition to the NCOP credits already posted, NCO has agreed to post an additional,

1

approximate $15.8 million in NCOP credits across the NCOP accounts applicable to the settlement. The undersigned has been given specific authority to ensure settlement compliance. Accordingly, the undersigned finds that the proposal complies with the settlement terms and recommends that the below Order be entered regarding the final posting of NCOP credits.

## DISCUSSION

On November 3, 2005, the Parties executed the Agreement, which was approved by the Court. The Agreement provides the following regarding NCOP credits:

> NCOP credits will be awarded on the second Tuesday after Final Judgment Day (hereinafter referred to as "NCOP Credit Day"). Each Settlement Class Member with an open NCOP account on NCOP Credit Day with Right Party Contact before September 30, 2005 shall receive a 10% credit on his or her NCOP account, with a maximum cap of $164. In other words, the credit will be for 10%, but never to exceed $164.

Agreement, at ¶ 23(B).

In compliance with the Agreement, NCO posted NCOP credits on April 20 and May 4, 2006. Following application of the credits, a dispute arose regarding the interpretation of ¶ 23(B) with respect to application of the NCOP credits. Specifically, NCO contended that it was *not* obligated to post credits for accounts closed in the "normal course of business" after the Agreement was executed. In support of its argument, NCO relied on the Agreement, which provides that "[e]ach Settlement Class Member with an *open NCOP Account on NCOP Credit Day* . . . shall receive a 10% credit." *Id.* (emphasis added). Class Counsel contended that the Parties negotiated based upon an aggregate amount of credits. According to Class Counsel, NCO was obligated to provide the negotiated aggregate amount of credits,

2

regardless of whether some of the applicable accounts were closed after the Agreement was executed. Class Counsel contended that an additional amount of NCOP credits should have been applied.

After several telephone conferences and briefing on the issue, in an attempt to resolve the dispute, NCO ultimately agreed to post an additional, approximate $15.8 million in NCOP credits. This $15.8 million provides credit for the non-bankrupt accounts sold after the Agreement was executed and credit for the accounts included as part of the "September snapshot" that were coded as being in Chapter 7 at that time and used as a basis for negotiation of the settlement. NCO has agreed to apply the approximate $15.8 million in credits across the approximate 1,590,185 in remaining open NCOP accounts with Right Party Contact before September 30, 2005. Applying the credits equally, approximately $9.96 will be applied to the remaining applicable open NCOP accounts. As with the previous credit posting, to the extent that the account balance for any applicable account is $9.96 or less, the account will be closed.

Notwithstanding Class Counsel Elizabeth J. Arleo's August 18, 2006 opposition to NCO's proposal, the undersigned finds that NCO's proposal complies with the terms of the settlement and recommends that the below Order be entered, ordering NCO to post the additional, approximate $15.8 million in credits no later than October 1, 2006.

## CONCLUSION

For the reasons set forth above, and pursuant to Fed. R. Civ. P. 53, the undersigned respectfully recommends that the Court enter the below Order, ordering NCO to post the additional, approximate $15.8 million in credits no later than October 1, 2006.

Fed. R. Civ. P. 53(f) Report and Recommendation                    Case No. 04CV2266 DMS (RBB)
Regarding Final Posting of Credits and [Proposed] Order

1    IT IS SO RECOMMENDED,

2    This ____ day of _____ 2006.

3    _____

4    Judge Herbert B. Hoffman (Ret.)

5    IT IS SO ORDERED,

6    NCO shall post the additional, approximate $15.8 million in NCOP credits no later

7    than October 1, 2006.

8    This ____ day of _____ 2006.

9

10   _____

     Honorable Dana M. Sabraw

11   N:\NCO\Nutter\Correspondence\Class Action Settlement\Final Draft R&R Docs\R&R Re. Credits.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                              4

28   Fed. R. Civ. P. 53(f) Report and Recommendation          Case No. 04CV2266 DMS (RBB)
     Regarding Final Posting of Credits and [Proposed] Order

1  David Israel, Esq. (LSB No. 7174)      (SPACE BELOW FOR FILING STAMP ONLY)

Bryan C. Shartle, Esq. (LSB No. 27640)

2  SESSIONS, FISHMAN & NATHAN, L.L.P.

3  3850 North Causeway Boulevard

Lakeway Two, Suite 1240

4  Metairie, Louisiana 70002-1752

Telephone:  (504) 828-3700

5  Facsimile:   (504) 828-3737

6  Thomas J. Lincoln, Esq. (CSB No. 095131)

7  Jill S. Dickerson, Esq. (CSB No. 220070)

LINCOLN, GUSTAFSON & CERCOS

8  225 Broadway, Suite 2000

San Diego, California 92101

9  Telephone: (619) 233-1150

Facsimile:  (619) 233-6949

10

11  Attorneys for Defendant

12             UNITED STATES DISTRICT COURT

13          SOUTHERN DISTRICT OF CALIFORNIA

14  CHERI J. NUTTER,        )  Case No. 04CV2266 DMS (RBB)

15            Plaintiff,  )

16                  )  **SWORN STATEMENT OF**

                      )  **JOSHUA GINDIN**

17    -against-         )

18  NCO FINANCIAL SYSTEMS, INC.,  )

19            Defendant.  )

20  JANNIE DUPREE,        )

21            Plaintiff,  )

22    -against-         )

23  NCO FINANCIAL SYSTEMS, INC.,  )

24            Defendant.  )

25

26

27

28

                          1

**EXHIBIT B**

STATE OF PENNSYLVANIA

COUNTY OF MONTGOMERY

I, JOSHUA GINDIN, hereby confirm under oath the following:

1.  I am an Executive Vice President and the General Counsel for NCO Group, Inc. ("NCO Group"). NCO Group is the ultimate parent corporation for NCO Financial Systems, Inc. ("NCO Financial") and NCO Portfolio Management, Inc. ("NCO Portfolio").

2.  In my role as General Counsel, I oversee all legal functions for NCO Group and its various operating businesses, including:   real estate; litigation; mergers and acquisitions; contract negotiations; and, generally all related legal issues facing the NCO businesses.  Based upon my responsibilities, I have independent and personal knowledge of the facts in this affidavit.

3.  I am familiar with the allegations in the above-captioned lawsuit and the Settlement Agreement ("Agreement") executed by the parties.  I have also reviewed Ms. Elizabeth J. Arleo's August 18, 2006 letter, addressed to Judge Herbert B. Hoffman.

4.  In compliance with the Agreement, NCO Financial posted NCO Portfolio credits on April 20 and May 4, 2006, totaling $215,183,424.88. These NCO Portfolio credits were spread across the remaining open, applicable 1,590,185 NCO Portfolio accounts.  No further NCO Portfolio credits are owed.

5.  As part of its normal business practice, NCO Portfolio sold a total of 145,196 of its accounts through sales occurring at the end of each fiscal quarter from September 2005 to March 2006.  Of these 145,196 accounts, 70,366 of the sold accounts were in bankruptcy, 74,830 were not.  Selling part of a portfolio at the end of a fiscal quarter is a common business practice used by debt purchasers, such as NCO Portfolio.  For at least the last 4 years, NCO Portfolio has sold part of its portfolio at the end of one or more fiscal quarters.

6.  In her August 18, 2006 letter, Ms. Arleo contends that the sold NCO Portfolio accounts "are subject to a repurchase clause in the sales agreement, which clause will allow NCO to easily compel the purchaser to either (1) issue the 10% credit, or (2) return the account to NCO." Ms. Arleo is wrong for at least 3 reasons.  First, NCO Portfolio's standard sale document does not provide NCO Portfolio with a right to repurchase accounts.  From time-to-time, NCO Portfolio is able to repurchase an account or two from a buyer for certain discrete reasons, like disputes or bankruptcies.   Second, even if NCO Portfolio could repurchase the accounts, with respect to the accounts in question, the cost to do so would be substantially more than received by NCO Portfolio.  In other words, NCO Portfolio would have to pay a premium to buy these accounts back.  Third, and perhaps most importantly, a buy-back would create insurmountable administrative problems.  Since the sale, many of the sold accounts have been paid, closed for numerous reasons, and sold to other buyers.  It would

1   be impossible to buy all of the sold accounts back and then attempt to apply credits to the
2   accounts.

3       7.      The information contained in this statement is true and correct to the best of
    my knowledge and belief.

4

5                                                    JOSHUA GINDIN

6

7   DATE Sept. 14, 2006

8   n:\aco\rutter\correspondence\class action settlement\final draft r&r docs\gindin sworn statement.doc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sworn Statement of Joshua Gindin                    3                Case No. 04CV2266 DMS (RBB)

# Arleo Law Firm, PLC

Elizabeth J. Arleo
Elizabeth@ArleoLaw.com

August 18, 2006

<u>VIA FACSIMILE</u>
619/ 595-5450

The Honorable Herbert B. Hoffman
Judge of the California Superior Court, Retired
Symphony Towers
750 B Street, Suite 3300
San Diego, CA 92101

Re:   *Nutter v. NCO Financial Systems, Inc. (05-21)*

Dear Judge Hoffman,

This letter states my objection to NCO's R&R Re: Final Posting of Credits dated July 27, 2006.

NCOP's sale of 145,196 accounts two months before final approval was improper. These accounts were not closed as a result of death, bankruptcy and payoffs. Nor is this a "dispute ... regarding the interpretation" of the settlement agreement" as NCO contends.

In December, 2005, all class members (including these accounts) were notified they would receive a 10% credit if their account remained "open" when the settlement was finally approved. The 145,196 accounts represent 8.28% of the initial 1.75 million accounts subject to receiving a credit. They were due to receive over $21.5 million of the $241 million credits. Paying other class members what properly belongs to the 145,196 accounts does not fulfill NCO's promise.

The fact that NCOP no longer owns the 145,196 accounts does not prevent it from issuing the 10% credit as promised. These accounts are subject to a repurchase clause in the sales agreement, which clause will allow NCO to easily compel the purchaser to either (1) issue the 10% credit, or (2) return the account to NCO.

If Your Honor believes the terms of the R&R provide an adequate resolution, I respectfully request an opportunity to brief the issue before Judge Sabraw.

Sincerely,

Elizabeth J. Arleo

cc:   David Israel & Bryan Shartle



EXHIBIT
C

850 Main Street • Suite 201 • Ramona, CA 92065 • 760.789.8000 • Fax 760.789.8081 • www.arleolaw.com

STEVEN A. WICKMAN

# WICKMAN & WICKMAN
### CONSUMER RIGHTS ATTORNEYS
5151 MURPHY CANYON ROAD, SUITE 100
SAN DIEGO, CA 92123-4339
TEL: (058) 292-0009
FAX: (888) 277-3456
WWW.WICKMANLAW.COM

CHRISTINA E. WICKMAN

September 21, 2006

**Via Facsimile (504) 828-3737**

David Israel, Esq.
Bryan Shartle, Esq.
Sessions, Fishman & Nathan, L.L.P.
3850 North Causeway Boulevard
Lakeway Two, Suite 1240
Metairie, LA 70002-1752

      Re:    *Nutter v. NCO Financial Systems, Inc.*
           Case No. 04-cv-2266 DMS (RBB), USDC, Southern District of California,

Dear Messrs Israel and Shartle:

Please allow this correspondence to confirm that Class Counsel, Steven A. Wickman and Christina E. Wickman of Wickman & Wickman, are in agreement with NCO's proposal to apply the last round of NCOP credits of approximately $15.8 million to the open NCOP accounts, in accordance with NCO's Memorandum in Support of Posting of Final Credits dated September 14, 2006. While this does not amount to a perfect fix, we feel that, under the circumstances, it is the best solution.

Sincerely,

Christina E. Wickman, Esq.


EXHIBIT
D